UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|   |   |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | ) |
| v. | ) No. 1:22-cr-00023-LEW |
| | ) |
| **DAVISTON JACKSON**, | ) |
| | ) |
| Defendant | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The matter before the Court is Defendant Daviston Jackson's Motion to Suppress (ECF No. 596). Jackson argues that his Fourth and Fifth Amendment rights were violated during a traffic stop in New Hampshire, and he moves for suppression of his statements and evidence.

A hearing on Jackson's motion, with testimony from New Hampshire State Trooper Geoffrey Miller, who initiated the traffic stop, was held on December 11 and 12, 2023.[1] For the reasons below, Jackson's motion to suppress is DENIED.

### BACKGROUND

Jackson is one of seventeen individuals indicted by a federal grand jury in February 2022 for his alleged role in conspiring to distribute controlled substances.[2] Jackson now

---

[1] The hearing was held in conjunction with Jackson's other motion to suppress as well as the motions filed by co-defendants Daquan Corbett and James Valiante.

[2] All seventeen individuals were indicted for conspiring to distribute and possess with the intent to distribute 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing methamphetamine, and 400 grams or more of a mixture or substance containing fentanyl. 21 U.S.C. § 846; *id.* §§ 841(a)(1), (b)(1)(A)(vi), (viii).

moves to suppress evidence and statements from a traffic stop on May 27, 2020.  Based on Trooper Miller's testimony and the exhibits, I make the following findings of fact.

At about 2:18 a.m. that morning, New Hampshire State Trooper Geoffrey Miller was parked facing south on Interstate 95, in Greenland, New Hampshire, on patrol duty when he saw a vehicle approaching at a high rate of speed.  Trooper Miller clocked the vehicle traveling south at 112 miles per hour in a 65-mile-per-hour zone.  After the vehicle passed him, Trooper Miller activated his emergency lights and pulled onto the highway. The vehicle came to a near stop in the middle of the highway before eventually pulling over in the right breakdown lane.  From behind, Trooper Miller saw the driver moving around and leaning toward the right, where a passenger sat.  The driver seemingly handed something to the passenger, so Trooper Miller notified dispatch about the stop and requested assistance.

Trooper Miller went to the passenger side of the vehicle, a Chrysler Pacifica, to speak with the male driver and female passenger.  Trooper Miller asked the driver for his license and registration, and he identified the driver as Daviston Jackson.  Jackson explained that the Pacifica was a rental car, though he did not know where the rental agreement was.  Upon his request, Jackson gave Trooper Miller the rental paperwork, which stated that Jackson rented the vehicle from Hertz in Massachusetts and that the vehicle was due four weeks ago, on April 29.  Next, Trooper Miller asked Jackson if he knew why he was stopped.  Jackson answered that it was likely because he was speeding, but he did not know how fast he was going.  Later, Jackson guessed that he was driving

2

around 80 miles per hour.  Trooper Miller explained that Jackson was driving at 112 miles per hour, and Jackson was surprised.

While speaking with Jackson, Trooper Miller saw that the passenger was wearing a jacket with front pockets, and she had a large roll of cash held together by a rubber band sticking out of her right front-breast pocket.  Trooper Miller thought that this was strange because people do not ordinarily handle cash this way, and he knew from experience that individuals engaged in drug trafficking often use elastic bands to bundle cash from drug transactions.  Trooper Miller also knew that drug trafficking on I-95 was becoming more common.

Trooper Miller asked Jackson why he moved around as he was being pulled over, and Jackson responded that he did not know that he moved around.  Trooper Miller walked around to the driver's side of the vehicle and for his own safety, he asked Jackson to exit the vehicle.  Once Jackson was behind the vehicle, Trooper Miller frisked him for weapons, and he felt none.  Next, Trooper Miller asked Jackson why he was traveling so fast, and Jackson explained that he was driving home to Roxbury, Massachusetts.  In response to Trooper Miller asking where they came from, Jackson said they visited a friend from school in Portland, Maine, for a few hours.  Trooper Miller asked about the passenger, and Jackson said that she was his ex-girlfriend.  Trooper Miller then asked Jackson if there was any cash in the vehicle, and Jackson thought to himself for a moment before initially saying no.  Jackson then explained that he had between $4,000 and $5,000 in his wallet, though he normally did not carry that much cash.  Trooper Miller asked how he got the cash, and Jackson said that it came from unemployment checks that were deposited in his bank

3

account.  Trooper Miller asked Jackson if he had withdrawal slips from the bank, and he said no and that he withdrew the cash from an ATM.  Trooper Miller asked Jackson if he withdrew all the cash at once, and Jackson said yes.  Trooper Miller thought that this was strange because he knew that ATMs typically have a withdrawal limit of $500 per day.  He asked Jackson for an ATM receipt, but Jackson did not have one.

After Sergeant Thomas Conlon and Trooper Lauren Hervieux arrived, Trooper Miller spoke with the passenger, who was still inside the vehicle.  Trooper Miller asked her where they were coming from, and she answered that she did not know what town they went to, but she explained that it was about three or four hours north in Maine.  Trooper Miller noted that this was inconsistent with Jackson's answer because Portland was only one hour away.  The passenger said that they stayed with one of Jackson's friends for the holiday weekend and that they were now heading home.  Trooper Miller asked her what the friend's name was, but she did not know.[3]  Trooper Miller also observed that the vehicle had no luggage or objects suggesting that they traveled for a weekend trip.  Trooper Miller asked the passenger about the cash in her pocket, and she explained that it was from her unemployment check, though she did not know how much money it was.  Trooper Miller

---

[3] On this point, Trooper Miller's testimony conflicted with his police report.  Trooper Miller testified that the passenger knew that the friend's first name was Junior, but she did not know his last name.  But in Trooper Miller's police report, he stated that the passenger did not know the friend's first name as well.  Gov't's Ex. 1 at 10.  None of the lawyers seem to have noticed this discrepancy.  Because Trooper Miller's report was authored about two weeks after the stop, I find that his testimony on this limited point was not credible and that the passenger did not know the friend's first name.  I note that Trooper Miller testified three-and-a-half years after this stop, and his testimony otherwise mirrored his police report.  This discrepancy does not affect my analysis.

asked her if she normally carries large amounts of cash like that in her jacket pocket, and she answered yes.

Because Jackson and the passenger offered conflicting tales of their trip, Trooper Miller asked Jackson once again where they came from. Jackson reiterated that they left Massachusetts to visit a friend near Portland for a few hours. Trooper Miller asked Jackson what his friend's name was, and he responded, "Junior," but he did not know his last name. Trooper Miller found this strange because Jackson previously said that he went to school with his friend. Next, Trooper Miller told Jackson that his version of events differed from the passenger's explanation, and Trooper Miller asked if they spent the weekend at Junior's house. Jackson answered that they were there for only a few hours.

Trooper Miller explained to Jackson that the vehicle should have been returned to Hertz several weeks ago. Jackson claimed that he spoke with a friend who works for Hertz and that this friend extended the rental period for him, but Jackson had no paperwork or email to prove this. Throughout their conversation, Trooper Miller observed that Jackson was nervous, with his arms and legs visibly shaking. Trooper Miller suspected that Jackson and the passenger were involved drug trafficking. From his experience, he knew that individuals engaged in drug trafficking often use rental cars to transport drugs to a location where the drugs are sold for cash.

Trooper Miller then called Hertz, spoke with a representative, and inquired about the Pacifica. The Hertz representative confirmed that the vehicle was overdue, and she requested that it be towed and impounded. By around 3:05 a.m., dispatch arranged for the Pacifica to be towed. Trooper Miller explained to Jackson that the vehicle was going to be

towed, and he asked Jackson if the $4,000 to $5,000 was in his wallet, to which Jackson answered yes.  Trooper Miller thought that this was unusual because most wallets could not fit that much cash.  To learn more about where the cash came from, Trooper Miller asked if Jackson could show him that the cash was withdrawn from his account and that it came from unemployment benefits.  On his cellphone, Jackson showed Trooper Miller his bank transactions, which included weekly deposits of about $800 dating back to March 2020, though none of these deposits were labeled as coming from a government entity.  Trooper Miller asked Jackson if he could show him the transaction when he withdrew the money from an ATM, and Jackson, now even more nervous, looked for it over several minutes.  Eventually, Trooper Miller said he believed that Jackson was concealing the true source of the money, and he explained the inconsistencies between Jackson and the passenger's explanation of their trip.  Afterwards, Trooper Miller asked Jackson what town they went to, and Jackson said they went to Bangor.  Trooper Miller knew that Bangor was about two hours north of Portland.

After asking dispatch to run a criminal-records check on Jackson and reviewing the report, Trooper Miller explained to Jackson why he believed that they were involved in drug trafficking.[4]  Trooper Miller also asked the passenger if she could produce any

---

[4] Before speaking with Jackson again, Trooper Miller reviewed the criminal history report that dispatch sent to him.  Having misread these Massachusetts criminal history reports, he believed that Jackson had prior convictions in Massachusetts for drug trafficking and possession with the intent to distribute.  Trooper Miller later learned that Jackson was charged with these offenses, but they were dismissed; Jackson was never convicted of these offenses.  Trooper Miller's mistaken belief that Jackson had previous drug-related convictions and Jackson's dismissed charges play no role in my analysis below.  At best, facts concerning an individual's criminal history and arrest record are of minimal probative value when it comes to evaluating whether reasonable suspicion or probable cause existed.  *See United States v. Monteiro*, 447 F.3d 39, 48 (1st Cir. 2006).

information about the withdrawal of the cash from the bank account, and she said no. Trooper Miller said that he believed that the cash came from a drug sale, and he instructed Jackson to retrieve the cash from the passenger and to give it to him, which Jackson did.

Trooper Miller issued Jackson a summons to appear in court for reckless driving. Since the Pacifica was going to be towed, Trooper Miller offered to drive Jackson and the passenger to a nearby rest area in Salisbury, Massachusetts. They accepted this courtesy ride. Trooper Miller asked Jackson if there was anything that he wanted to take from the Pacifica, and Jackson said that he wanted to take his backpack. As he performed an inventory search of the Pacifica, Trooper Miller observed green flakes that appeared to be marijuana[5] scattered across the floor behind the front seats, and he retrieved Jackson's backpack from the back seat. To protect the officers during the courtesy ride, Troopers Miller and Hervieux searched the backpack's contents. They saw multiple stacks of $100 and $20 bills secured by rubber bands, well in excess of $5,000. Trooper Miller seized the cash. Later, the cash was counted, and it was $14,000. During the stop, Trooper Hervieux also observed that Jackson possessed two cellphones. Based on her experience, she knew that individuals involved in drug trafficking often carry a second cellphone.

## DISCUSSION

Jackson moves to suppress evidence and his statements on the ground that his Fourth and Fifth Amendment rights were violated during the stop. Jackson presents three arguments as to why suppression is appropriate. First, Jackson argues that the stop was

---

[5] Possession and distribution of marijuana, outside of the medical marijuana context, were illegal in New Hampshire at the time of the stop. *See* N.H. Rev. Stat. Ann. § 318-B:26.

unlawfully prolonged, in violation of the Fourth Amendment.  Second, Jackson contends that Trooper Miller violated his Fifth Amendment rights by interrogating him without Jackson waiving his *Miranda* rights.  Third, Jackson argues that the cash was seized without probable cause, making the seizure unlawful.  In response, the Government argues that any extension in the stop's duration was supported by reasonable suspicion.  The Government contends that Jackson was never in custody, so his Fifth Amendment rights were not violated.  Lastly, the Government maintains that the cash seizure was supported by probable cause.  I address each argument in turn.

## A. The Scope and Duration of the Stop

Jackson does not contest the validity of the initial traffic stop; instead, he argues that the stop was unreasonably longer than necessary to address reckless driving.  The Government maintains that any extension to the stop's duration was supported by reasonable suspicion that Jackson and the passenger were engaged in drug trafficking.

The Fourth Amendment of the Constitution prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  This right "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  "A traffic stop constitutes a seizure of 'everyone in the vehicle'" and "thus must be supported by reasonable suspicion that a traffic violation has occurred."  *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

During a lawful traffic stop, a police officer may "require the driver of a car . . . to step out of his vehicle." *United States v. Coplin*, 463 F.3d 96, 102 (1st Cir. 2006); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6 (1977) (per curiam). A "pat-frisk may accompany an investigatory stop whenever an officer 'has reason to believe that the suspect is armed and dangerous.'" *United States v. Pontoo*, 666 F.3d 20, 30 (1st Cir. 2011) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968). The officer must have "some articulable, reasonable suspicion that the" person to be frisked "may be dangerous." *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011).

"[R]easonable suspicion must be premised upon 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Pontoo*, 666 F.3d at 27–28 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also United States v. Hensley*, 469 U.S. 221, 229 (1985) (explaining that there must be "specific and articulable facts" supporting reasonable suspicion). The existence of reasonable suspicion depends on the "totality of the surrounding circumstances," *United States v. Dion*, 859 F.3d 114, 124 (1st Cir. 2017), with "a measurable degree of deference to the perceptions of experienced law enforcement officers," *United States v. Ruidíaz*, 529 F.3d 25, 29 (1st Cir. 2008).

Authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). Thus, the "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's

'mission'—to address the traffic violation that warranted the stop." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "In carrying out the seizure's 'mission,' an officer is also permitted to undertake those 'ordinary inquiries incident to [the traffic] stop,'" "which include 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018) (alteration in original) (quoting *Rodriguez*, 575 U.S. at 355). Officers may also "inquire into the driver's itinerary." *Dion*, 859 F.3d at 125. "[W]hile an officer's actions must bear some relation to the purpose of the original stop," officers may shift their "focus and increase the scope of" their "investigation by degrees if" their "suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). There "is no talismanic time beyond which any stop initially justified on the basis of [reasonable suspicion] becomes an unreasonable seizure under the [F]ourth [A]mendment." *United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (quoting *United States v. Davies*, 768 F.2d 893, 901 (7th Cir. 1985)). Instead, the reasonableness of a stop's duration is evaluated on a case-by-case basis. *See, e.g.*, *United States v. Ramdihall*, 859 F.3d 80, 88 (1st Cir. 2017) (holding that an 82-minute stop was reasonable under the circumstances).

The stop, measured from when Trooper Miller stopped the Pacifica to when he issued Jackson a citation, lasted about forty-five minutes. I reject Jackson's contentions that Trooper Miller exceeded the permissible scope of investigation and impermissibly extended the stop's duration because I conclude that his investigation was supported by

reasonable suspicion of drug trafficking that developed by orders of magnitude throughout the stop.

First, Jackson argues that the frisk was unsupported by reasonable suspicion and thus impermissibly continued the stop.  Rather than advancing this argument in his motion to suppress, Jackson debuts this argument in his closing argument memorandum filed after the suppression hearing.  *See* Mem. in Supp. of Mot. to Suppress, ECF No. 680 at 7. Jackson's motion to suppress takes aim with a blunderbuss, vaguely challenging the legality of a "search," but it is unclear what search he is referring to.  Jackson could be challenging the frisk; the inventory search; or the search of the backpack.  *See* Mot. at 1. Because Jackson's "original motion to suppress" did not advance an argument concerning the legality of the frisk, this argument "is waived."  *United States v. Centeno-González*, 989 F.3d 36, 48 (1st Cir. 2021); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Alternatively, I reject Jackson's argument on the merits because I conclude that Trooper Miller had reasonable suspicion to believe that Jackson was "armed and dangerous."  *Pontoo*, 666 F.3d at 30.  Trooper Miller testified that shortly after he activated his emergency lights and initiated the stop, the Pacifica nearly stopped in the middle of the highway, and he saw Jackson lean toward the passenger and potentially hand something to her.  *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (holding that a "driver's behavior," such as "erratic driving" "may be relevant" in determining whether there is reasonable suspicion to stop a vehicle); *United States v. Soares*, 521 F.3d 117, 120

(1st Cir. 2008) (reasoning that officers seeing two people in a vehicle "ben[t] over toward their left, as if putting something on the floor" contributed to reasonable suspicion to pat-frisk them).   When asked about this, Jackson said that he was unaware that he was moving around in the vehicle.   Before frisking Jackson, Trooper Miller saw that the passenger had a large bundle of cash sticking outside of her jacket's pocket.   I credit Trooper Miller's testimony that drug trafficking on I-95 was becoming more common and that individuals involved in trafficking drugs often used rental cars and wrapped their cash with rubber bands, so the totality of the circumstances support that there was reasonable suspicion to frisk Jackson for weapons.   *See United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014) (describing the "connection between drugs and violence" as "legendary").   Thus, to the extent that the frisk extended the stop, it was justified.[6]

---

[6] Even if Jackson was correct that the frisk was not supported by reasonable suspicion, I would hold that suppression of all the evidence found later during the stop is an improper remedy.   As Judge Woodcock has recently observed, there is a developing Circuit split concerning the Supreme Court's decision in *Rodriguez*. *See United States v. Martinez*, No. 2:22-CR-00086-JAW, 2023 WL 9002781, at *14 n.6 (D. Me. Dec. 28, 2023).   The Third Circuit has observed that "the Court seems to imply that nearly anything an officer does outside the valid, traffic-based inquiries will be unconstitutional.   Yet, other language in the opinion suggests a more forgiving approach toward non-traffic-based actions." *United States v. Green*, 897 F.3d 173, 180 (3rd Cir. 2018).   Accordingly, some circuits have held "that any diversion from a stop's traffic-based mission is unlawful absent reasonable suspicion." *Id.* at 180–81; *see also United States v. Gomez*, 877 F.3d 76, 82 (2d Cir. 2017).   However, "[o]ther Circuits have applied *Rodriguez* more leniently, evaluating police actions by something more akin to a reasonableness standard." *Green*, 897 F.3d at 181; *see also United States v. Collazo*, 818 F.3d 247, 257–58 (6th Cir. 2016); *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016).   Based on my review of caselaw, the First Circuit has not taken a position on this developing circuit split, although there is growing reason to believe that the appeals court may ally with the wooden policy position that anything outside traffic-based inquiries constitutes a violation of the Constitution, at the very least.   Until such time as that policy becomes manifest in an opinion, we are merely counting how many angels can dance on the head of a pin.   So even if the frisk was unsupported by reasonable suspicion, I would find that any extension to the stop's duration resulting from this evidently brief frisk was harmless.

Second, Jackson contends that Trooper Miller's inquiry into where Jackson and the passenger came from was unrelated to reckless driving and unlawfully extended the stop. But Jackson's understanding of the permissible inquiries during traffic stops is too narrow and directly contradicted by First Circuit precedent. *See Dion*, 859 F.3d at 125 ("[O]ur case law allows an officer carrying out a routine traffic stop to request identification from the driver and to inquire into the driver's itinerary." (first citing *United States v. Fernandez*, 600 F.3d 56, 60–62 (1st Cir. 2010); and then citing *Chhien*, 266 F.3d at 9)); *see also Chhien*, 266 F.3d at 10 (reasoning that "travel questions" "were within the ambit of" an officer's authority to detain the defendant and that "any effect they might have had on the duration of the detention" was permissible). Insofar as Jackson's argument relies on Trooper Miller asking additional questions about his whereabouts, these additional questions were supported by reasonable suspicion given Jackson and the passenger's contradictory answers. *See United States v. Lamela*, 942 F.2d 100, 102 (1st Cir. 1991) (reasoning that "inconsistent responses to routine questions relating to the purpose of [the defendant's] travel" contributed to reasonable suspicion).

Lastly, Jackson asserts that Trooper Miller's questions about cash were unrelated to the reason for the stop and therefore impermissibly extended the stop. I conclude that this line of questioning was proper because it was supported by reasonable suspicion developed through Trooper Miller's observations. More specifically, the facts amounting to reasonable suspicion that Jackson was armed and dangerous also permitted Trooper Miller

to inquire about the bundle of cash that he saw.[7]  Jackson's answers to these initial cash-related questions permitted a further extension of the stop.  At first, Jackson said that there was no cash in the vehicle, but he then explained that he had between $4,000 and $5,000 in his wallet, which was strange since wallets cannot fit that much cash.  Jackson also claimed that this cash was from unemployment benefits, and he said that he withdrew it all at once from an ATM.  This did not make sense because ATMs have withdrawal limits. These improbable answers further supported reasonable suspicion.

Some of Trooper Miller's other observations also contributed to reasonable suspicion.  After Jackson and the passenger gave inconsistent answers about their travels, Trooper Miller saw that the Pacifica had no luggage, contradicting the passenger's explanation that they traveled for the long weekend.  *See Ramdihall*, 859 F.3d at 92 (reasoning that the defendant's explanation that he was on a multi-day trip "was not corroborated by the other circumstances" since the vehicle had no luggage, and this observation contributed to reasonable suspicion).  Jackson and the passenger did not know the last name of Jackson's friend from school that they had visited.  *See United States v. Molina-Gomez*, 781 F.3d 13, 20 (1st Cir. 2015) (reasoning that the defendant giving "odd and suspicious answers to routine Customs questions," including the defendant "not remember[ing] the last name[s] of" two friends that he visited was relevant to the reasonable suspicion analysis).  Throughout the conversation, Trooper Miller saw that

---

[7] Even if Trooper Miller's initial question about the cash was outside of the stop's permissible scope, I would similarly find that any resulting extension of the stop was, like the frisk, harmless because Jackson's answers permitted additional questioning.

Jackson was nervous.  *See United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988) (finding that the defendant's nervousness contributed to reasonable suspicion).  Collectively, Trooper Miller's observations amounted to reasonable suspicion that Jackson and the passenger were engaged in drug trafficking.

Because any extension in the stop's duration was supported by reasonable suspicion, I find that the stop's duration was constitutional.[8]  I next address Jackson's argument that his statements should be suppressed because his Fifth Amendment rights were violated.

## B.  Roadside Questioning

Jackson argues that his statements during the traffic stop should be suppressed because he was subject to a custodial interrogation.  The Government maintains that suppression is inappropriate because Jackson was never in custody.

The Fifth Amendment of the Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To safeguard the right against self-incrimination, the United States Supreme Court held in *Miranda v. United States* that a defendant's statements during a custodial interrogation are inadmissible during the prosecution's case in chief if the defendant was not advised of his *Miranda* rights and did not knowingly and intelligently waive his rights.  384 U.S. 436,

---

[8] Jackson's reference to *United States v. Morganstern*, 512 F. Supp. 3d 31 (D. Me. 2020) is unpersuasive because reasonable suspicion developed during this traffic stop.  There, an officer pretextually stopped a vehicle after he saw that the driver was not wearing a seatbelt.  *Id.* at 32.  The officer was investigating the driver's son for drug-related offenses, and he was instructed to get a K-9 to sniff the vehicle.  *Id.*  After stopping the driver, the officer took the driver's license and cellphone back to the police cruiser and began investigating her son's drug-related offenses as he waited for a K-9 to arrive on the scene to sniff the vehicle.  *Id.* at 33–34.  Judge Hornby granted the defendant's motion to suppress because the officer had no basis to delay the stop of the driver for the narcotics investigation.  *See id.* at 37.  Here, as discussed above, reasonable suspicion of drug-trafficking activity justified an extension to the stop's duration.

479 (1966).  For purposes of *Miranda*, a defendant is in custody if a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (alteration in original) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

Given this definition of custody, "*Miranda* warnings are [generally] not required during routine stops involving traffic matters." *United States v. Campbell*, 741 F.3d 251, 265 (1st Cir. 2013); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (explaining why "the usual traffic stop is more analogous" to a *Terry* stop rather than a formal arrest). But *Miranda* warnings become necessary when "a suspect has been 'subjected to restraints comparable to those associated with a formal arrest.'" *Campbell*, 741 F.3d at 266 (quoting *Berkemer*, 468 U.S. at 441).  This custody analysis entails two steps.  First, in determining whether a reasonable person would have felt at liberty to terminate the interrogation and leave, a court considers "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Cruz-Rivera*, 14 F.4th 32, 48 (1st Cir. 2021) (quoting *United States v. Melo*, 954 F.3d 334, 340 (1st Cir. 2020)); *see also United States v. Ellison*, 632 F.3d 727, 729 (1st Cir. 2010) ("[B]ut a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of *Miranda*."); *United States v. Jones*, 187 F.3d 210, 218 (1st Cir. 1999) ("[N]o single element dictates the outcome of this analysis . . . .").  Second, a court considers "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of

station house questioning at issue in *Miranda*." *Cruz-Rivera*, 14 F.4th at 48 (quoting *Melo*, 954 F.3d at 340).

Jackson has failed to overcome the general rule that "*Miranda* warnings are not required during routine stops involving traffic matters," *Campbell*, 741 F.3d at 265, and he has not identified a single reason why he was "subjected to restraints comparable to those associated with a formal arrest," *Berkemer*, 468 U.S. at 441.

Regarding the first step of the custody analysis, the First Circuit has explained that public highways are "a neutral setting," so "police officers are not in a position to dominate as they are, for example, [when in] an interrogation room at a jailhouse." *Jones*, 187 F.3d at 218. *But see Cruz-Rivera*, 14 F.4th at 49 ("Where, as here, the police are controlling the situation the neutrality of the site is arguably brought into question."). And Jackson's interactions were primarily with Trooper Miller, who questioned him over the forty-five-minute stop, which disfavors finding that he was in custody. *See United States v. Crooker*, 688 F.3d 1, 12 (1st Cir. 2012) (holding that a defendant was not in custody when, among other factors, "no more than two agents were in direct conversation with" the defendant "at one time"); *United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) (reasoning that a roughly ninety-minute interview, with a twenty-minute pause to summon an EMT was "relatively short" and weighed against a finding that the defendant was in custody). Jackson was never subject to physical restraints or a show of force.[9] *See Crooker*, 688

---

[9] A New Hampshire State Police incident report labels Jackson as an "arrestee." *See* Gov't's Ex. 1 at 5. Trooper Miller testified that Jackson was never arrested, and he explained that the police reporting system required categorizing Jackson as an arrestee since he had to appear in court for reckless driving.

F.3d at 12 (noting that the defendant was "never physically restrained").  Though Jackson eventually entered the police cruiser, he voluntarily accepted a courtesy ride, and this was after Trooper Miller questioned Jackson.  *See United States v. Carr*, 534 F. Supp. 3d 143, 150 (D. Me. 2021) (explaining that when "a police officer asks a citizen to enter a police car in connection with the traffic stop, this alone does not 'elevate the detention beyond a *Terry* stop'" (quoting *United States v. Dunbar*, 553 F.3d 48, 56 (1st Cir. 2009)).  In sum, Jackson has not demonstrated that his freedom of movement was limited under the first step of the custody analysis.

Jackson fares no better on the second step because these facts confirm that this stop was "more akin to a routine traffic stop" than the ordinary custodial interrogation. *Campbell*, 741 F.3d at 266; *see also id.* ("[W]e also have recognized that, as 'a general rule, *Terry* stops do not implicate the requirements of *Miranda*, because *Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings.'" (quoting *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir. 1986))).

Because Jackson was not in custody, his Fifth Amendment rights were not violated. I now turn to Jackson's arguments concerning the cash seizure.

## C.  Cash Seizure

Jackson argues that Trooper Miller lacked probable cause to seize the cash held by the passenger as well as the cash within the backpack.  The Government defends both

seizures as being supported by probable cause that the cash was affiliated with drug trafficking.

The Fourth Amendment forbids unreasonable seizures.  U.S. Const. amend IV. Seizures of personal property are generally "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983).  However, "the plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015). Probable cause exists when "the facts and circumstances as to which the police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." *Robinson v. Cook*, 706 F.3d 25, 32 (1st Cir. 2013).

Thus, officers may seize an object without a warrant when "probable cause exists [because] the incriminating character of [the] object is immediately apparent to the police." *United States v. Paneto*, 661 F.3d 709, 714 (1st Cir. 2011) (second alteration in original) (quoting *United States v. Sanchez*, 612 F.3d 1, 5 (1st Cir. 2010)).  Officers "need not be certain of the incriminating character of an object, but, rather, must have a belief based on a 'practical, nontechnical probability' that the object is evidence of a crime." *Id.* (quoting *United States v. Giannetta*, 909 F.2d 571, 579 (1st Cir. 1990)); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

I begin with the seizure of the $800 from the passenger and find that its seizure was supported by probable cause.  Shortly after stopping the minivan, Trooper Miller saw a large bundle of cash in the passenger's breast pocket.  After asking Jackson if he had a large amount of cash in the vehicle, Jackson answered no, but he then said that he had between $4,000 and $5,000 in his wallet.  Jackson later explained that this cash came from unemployment checks and that he withdrew it all at once from an ATM.  Trooper Miller observed that this was strange since ATMs have withdrawal limits, and Jackson was unable to produce documentation showing that the cash came from unemployment benefits and was withdrawn from an ATM.  By speaking with the passenger, Trooper Miller realized that her account of their whereabouts conflicted with Jackson's explanation, and Jackson later admitted that they went to Bangor, not Portland.  Throughout Trooper Miller's conversation with Jackson, he became increasingly nervous.  From experience, Trooper Miller knew that individuals participating in drug trafficking often use rental cars to transport drugs and bundle their cash proceeds with rubber bands.  Collectively, these observations supported a "practical, nontechnical probability" that the cash came from drug trafficking; therefore, the seizure was lawful.  *Paneto*, 661 F.3d at 714 (quoting *Giannetta*, 909 F.2d at 579).

In challenging the legality of the cash seizure from the backpack, Jackson first argues that the warrantless search of his backpack was unconstitutional.  Second, he argues that the officers lacked probable cause to seize the cash inside.

Like Jackson's argument about the frisk, Jackson has waived any argument concerning the search of the backpack because it was not developed in his motion.  *See*

*Zannino*, 895 F.2d at 17.  Instead, Jackson advanced this argument after the suppression hearing.  *See* Mem. in Supp. of Mot. to Suppress, ECF No. 680 at 8.  On the merits, Jackson's argument is not promising.  Because there was reasonable suspicion that Jackson was involved in drug trafficking and thus armed and dangerous, the officers could search Jackson's backpack before permitting him to have access to it while in the police cruiser.[10] *See United States v. Pardue*, 385 F.3d 101, 105 (1st Cir. 2004) (holding that a backpack search was "outside the bounds set by *Terry*" because an officer did not have "a particularized safety concern" when he searched the backpack because "it had already been taken away from" the defendant "and there was no apparent risk that [the defendant] could have obtained a weapon or anything else from it").

Trooper Miller made additional observations that further supported seizing the cash from the backpack.  While performing an inventory search of the Pacifica, Trooper Miller saw green flakes that appeared to be marijuana scattered across the floor behind the vehicle's front seats.  Trooper Hervieux observed that Jackson had two cellphones, which was common among individuals involved in drug trafficking.  After Jackson said that he wanted to take the backpack with him into the police cruiser, Troopers Miller and Hervieux searched it and saw numerous bundles of $100 and $20 bills wrapped in elastic bands. Both the location of the cash and the amount of cash, which clearly exceeded $5,000,

---

[10] Because I find that the backpack search was supported by reasonable suspicion, it is unnecessary to decide whether officer safety concerns unsupported by reasonable suspicion permit officers to search a passenger's belongings when that person is not under arrest but given a ride in a police cruiser. *Cf. State v. Harlan*, 758 N.W.2d 706, 708–10 (N.D. 2008) (surveying case law about whether officers may frisk passengers without articulable reasonable suspicion that they may have a weapon).

contradicted Jackson's earlier explanation.  In light of these observations, this "large amount of hidden currency '[was] strong evidence of . . . an illicit connection to drug trafficking." *United States v. $21,510.00 in U.S. Currency*, 144 F. App'x 888, 889 (1st Cir. 2005) (per curiam) (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992)).[11]  Thus, the seizure of the cash in the backpack was supported by probable cause.

## CONCLUSION

For the foregoing reasons, Jackson's Motion to Suppress (ECF No. 596) is **DENIED**.

Dated this 31st day of January, 2024

　　　　　　　　　　　　/s/ Lance E. Walker
　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[11] In arguing against probable cause, Jackson references *United States v. Owens*, No. 2:20-CR-00041-JDL, 2021 WL 2939935 (D. Me. July 13, 2021).  There, a Maine State Police trooper stopped a vehicle in June 2019 with New Jersey license plates for speeding. *Id.* at *1.  Owens was a passenger. *Id.*  The officer ordered the driver out of the vehicle for a field sobriety test. *Id.*  After the driver passed the test, the driver was handcuffed, and officers searched the car. *Id.* at *2.  In searching the vehicle, officers found $5,000. *Id.*  In October 2019, one of the same officers stopped a vehicle and recognized Owens from the June stop. *See id.* at *3.  The Government argued that there was reasonable suspicion to extend that traffic stop, and it relied, in part, on Owens being in a vehicle with $5,000 in June. *See id.* at *9.  Chief Judge Levy found that the officer's interaction with Owens in June did not support reasonable suspicion in the October stop. *See id.*  Chief Judge Levy emphasized that "[t]he June stop resulted in no discovery of incriminating evidence, no arrest, and no conviction." *Id.*  He also explained that "[a]s for the cash found in the car during the June stop, it is not illegal or inherently suspicious for persons to possess a large amount of cash in a car" because a "large amount of cash is, without more, simply a large amount of cash, and not evidence of criminal activity." *Id.*  *Owens* is distinguishable because it involved the possession of cash in the past and because Trooper Miller's collection of observations, including the cash, suggested in their totality that Jackson was involved in drug trafficking.