UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:22-cr-00023-SDN-1 |
| | ) | 1:22-cr-00023-SDN-2 |
| DAQUAN CORBETT, and | ) | |
| DAVISTON JACKSON, | ) | |
| Defendants. | ) | |

**ORDER**

Defendants Daquan Corbett and Daviston Jackson are both Black men charged with conspiring to distribute drugs. For various reasons, their case proceeded to jury selection twice before halting. Both times, Defendants stated through counsel that they observed no Black people in the venire; both times, Defendants objected to the composition of the venire on that basis.

Defendants requested records and data relating to the jury selection process, and the Jury Administrator furnished them. Defendants now move to dismiss the jury pool as not a fair and impartial collection of jurors.[1] Because both the selection method and the composition of the jury pool are constitutionally sound, Defendants' motion is DENIED.

**PROCEDURAL BACKGROUND**

On February 9, 2022, the Grand Jury indicted Corbett and Jackson on charges of conspiracy to distribute drugs in violation of 21 U.S.C. §§ 841 and 846. The Court set trial

---

[1] The Court heard oral argument on the motion on November 26, 2024, which I orally denied, indicating this written order would follow. ECF No. 886. Thereafter, both Defendants waived their right to a jury trial. ECF Nos. 887–88.

for September 9, 2024, with jury selection on September 3, 2024, before the Magistrate Judge by consent of the parties. ECF Nos. 742–43, 792. During jury selection, Defendants objected to the composition of the venire based on the apparent racial makeup of the venire. The Magistrate Judge denied the objection, but ultimately continued the selection process after a member of the jury pool tested positive for Covid-19. ECF No. 809.

On September 9, 2024, the Court rescheduled trial for a three-week period to begin December 2, 2024, with jury selection on November 6, 2024. ECF Nos. 811–12. On November 6, 2024, before jury selection began, Defendants again observed what they described as no Black people in the venire. ECF No. 881 at 2. Defendants moved to continue jury selection and trial, and requested records and data related to the jury selection process from the Office of the Clerk pursuant to 28 U.S.C. 1867(f). ECF Nos. 861, 864. The Court granted the motion to continue jury selection, ECF No. 865, and granted in part the motion for jury selection records, ECF No. 871. The Jury Administrator provided those records. ECF No. 872. The Court then denied the motion to continue trial but directed the Jury Administrator to provide additional records, ECF No. 876, which the Jury Administrator did, ECF No. 877, and the Court produced a scheduling order on any motions to challenge the jury, ECF No. 876.

In accordance with the deadlines, Defendants moved to dismiss the jury pool, ECF No. 881, and the Government responded in opposition, ECF No. 884.[2] The Court heard oral argument on the motion on November 26, 2024. ECF No. 886.

---

[2] Defendants style their motion as a motion to "dismiss the jury pool." ECF No. 881. The relevant statute, 28 U.S.C. § 1867, does not obviously permit such a motion: the defendant may "move to dismiss the indictment or stay the proceedings." § 1867(a). Because dismissing the jury pool would have the same practical effect as staying the proceedings until a new pool is summonsed, the Court treats Defendants' motion as a motion to stay.

2

## JURY SELECTION IN THE DISTRICT OF MAINE

The Jury Selection and Service Act of 1968 requires each United States district court to create "a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). The District of Maine's current plan ("Jury Plan")[3] went into effect on November 21, 2022, after it was approved by a reviewing panel. *See* 28 U.S.C. § 1863(a) ("The plan shall be placed into operation after approval by a reviewing panel . . . ."); ECF No. 872-10 at 12 (approving Jury Plan).

Under the Jury Plan, the Clerk of Court "maintain[s] one master jury wheel for the District of Maine, with two qualified jury wheels, one in Portland and one in Bangor."[4] Jury Plan at 2. To fill the master wheel, the Jury Plan relies primarily on the Maine Central Voter Registration System ("Voter Registration System"). *Id.* To further expand the cross-section represented in the master wheel, the Jury Plan authorizes the Clerk to supplement the master wheel with a list of "active licensed drivers and the list of state identification card holders maintained by the Maine Bureau of Motor Vehicles," excluding "individuals who are deceased, who no longer reside in the state, who possess expired licenses or identification cards, and who are under the age of 18." *Id.*

The Court contracts with an outside vendor to conduct this work. The vendor combines the Voter Registration System list, the active licensed drivers list, and the state

---

[3] The Jury Plan is available for review online at https://perma.cc/KE8N-DTG5. The Jury Administrator also provided the Jury Plan directly to Defendants in addition to the data provided. ECF No. 872-10.

[4] "The names of prospective jurors to serve on grand and petit juries in Bangor shall be selected at random from the merged source list from the counties of Aroostook, Franklin, Hancock, Kennebec, Penobscot, Piscataquis, Somerset, Waldo, and Washington; and shall be maintained in the master wheel for jury service in Bangor." Jury Plan at 3. "The names of the prospective jurors to serve on grand and petit juries in Portland shall be selected at random from the merged source list from the counties of Androscoggin, Cumberland, Knox, Lincoln, Oxford, Sagadahoc, and York; and shall be maintained in the master wheel for jury service in Portland." *Id.* at 3.

identification card holder list, and removes duplicate names.[5] *Id.*; *see* ECF No. 877-5 (letter to vendor). The result is a "merged source list." The outside vendor then runs an "automated pure random selection program" on the merged source list to choose 40,000 names for the master jury wheel. ECF No. 877-5 at 2.

The Clerk then uses the Jury Management System, an electronic data processing system, to randomly draw a certain number of names from the master wheel to create two qualified jury wheels, one for Division 1 (Bangor) and one for Division 2 (Portland). The Jury Plan requires the Clerk to draw at least 500 names from the master wheel for each qualified jury wheel (Bangor and Portland), but the Clerk determines the total number of names drawn "based on the juror demands of the Court."[6] Jury Plan at 4. At each step—pulling names for the master jury wheel and for the qualified jury wheels—the "purely randomized selection process" is designed to "ensure that the mathematical odds of any single name being picked are substantially equal." *Id.* at 3–4.

The Clerk sends each person pulled for the qualified jury wheel an initial qualification questionnaire ("Qualification Questionnaire"). *Id.* at 4. The prospective juror must complete the Qualification Questionnaire on paper or on the Court's website within ten days of receipt. For "each undeliverable questionnaire, as well as those to which no response has been received even after the Clerk has sent a follow up questionnaire," the Clerk will "send a replacement questionnaire to a [different] prospective juror within the same zip code area" as the original prospective juror. *Id.* at 4. If the Clerk identifies

---

[5] A "true duplicate" will be removed only when two criteria match perfectly: First, the entire name (first name, middle initial, and last name) of each individual must match exactly. Second, if the names match, the dates of birth must match exactly. If birth date information is unavailable, a perfect match of the first five characters of the individuals' home addresses can serve as an alternative second criterion. ECF No. 877-5 at 1–2.
[6] As of November 6, 2024, the qualified wheel for Bangor consists of 6493 names. ECF 872-13.

4

any "omission, ambiguity, or error [in a Qualification Questionnaire] the Clerk shall return the questionnaire with instructions" to correct it. *Id.* at 4. To assign jurors to grand and petit jury pools, the Clerk draws names at random from the list of prospective jurors who have returned Qualification Questionnaires and are deemed qualified and issues a summons to each person picked. *Id.* at 5.

The Jury Plan explains how jurors may be deemed unqualified, exempt, or excused. First, under 28 U.S.C. § 1865(b), a person is qualified for jury service unless basic requirements such as age and citizenship are not met.[7] Second, public safety professionals and government employees are categorically exempt and thus barred from service.[8] Third, certain otherwise qualified and non-exempt jurors may nonetheless be excused from service "upon individual request" pursuant to and in accordance with the requirements of 28 U.S.C. § 1863(b)(5). Jury Plan at 7. Those include:

> a. all persons seventy-five years of age or older;
> b. all attorneys, physicians, surgeons, and dentists, actively so engaged;
> c. all persons who have served as grand or petit jurors in a state or federal court within the preceding two (2) years;
> d. volunteer safety personnel;
> e. all persons who have active care and custody of a child or children

---

[7] A juror is qualified "unless [the person]—
   (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
   (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
   (3) is unable to speak the English language;
   (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
   (5) has a charge pending against [the person] for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and [the person's] civil rights have not been restored."
28 U.S.C. § 1865(b).

[8] In particular, "(A) members in active service in the Armed Forces of the United States; (B) members of the fire or police departments of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession; [and] (C) public officers in the executive, legislative, or judicial branches of the Government of the United States, or of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession, who are actively engaged in the performance of official duties" are exempt. 28 U.S.C. § 1863(b)(6).

>under ten years of age whose health and/or safety could be jeopardized by such person's absence for jury service; or if such person is essential to the care of aged or infirmed persons;
>f. all persons whose services are essential to the operation of a business, commercial, or agricultural enterprise, such that the business could not function in their absence;
>g. all persons showing good cause that service as a juror would likely cause undue financial hardship; or
>h. all persons showing good cause that service as a juror is not possible due to mental or physical infirmity

Jury Plan at 7. As required by § 1863(b)(5) to allow for such excusals upon individual request, the Jury Plan explains "the Court finds that jury service by members of [those] occupational classes or groups of persons may entail undue hardship or extreme inconvenience." Jury Plan at 7. Therefore, a member of one of the listed groups will be excused from jury service upon request.

## DISCUSSION[9]

### I. Fair Cross-Section

The Sixth Amendment guarantees criminal defendants a trial by "an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The constitutional right to a jury trial "contemplates a jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). The Jury Selection and Service Act likewise guarantees all litigants a trial by jury "selected at random from a fair cross section of the community in the district or division wherein the

---

[9] The United States argues Defendants' motion is procedurally deficient because it fails to include a "sworn statements of facts which, if true, would constitute a substantial failure to comply with the provisions of this title." 28 U.S.C. § 1867(d). The First Circuit treats this as a "strict prerequisite[]." *United States v. Foxworth*, 599 F.2d 1, 3 (1st Cir. 1979). Though Defendants did not file a sworn statement, they rely on the Jury Administrator's affidavit which provides adequate facts on which I can resolve the motion. Other Courts of Appeals have held that "sworn testimony of the clerk" is "sufficient to provide the district court with a basis for making a decision" and thus constitutes "sufficient compliance with the statute's procedural requirements." *United States v. Calabrese*, 942 F.2d 218, 222 (3d Cir. 1991). The First Circuit has not directly addressed whether such sworn testimony is adequate when it doesn't accompany the motion directly, but I need not decide that question now because the motion fails on other grounds.

6

court convenes." 28 U.S.C. § 1861. Here, the Court sits in the Bangor division of the District of Maine.

To prevail on a constitutional or statutory fair cross-section challenge, a defendant must show three things, in this order:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). If the defendant fails to show any element, the analysis concludes.[10]

The fair cross-section requirement does not demand "venires [be] a substantially true mirror of the community." *United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999) (quoting *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir. 1985) (en banc)). Nor does it "guarantee that juries be 'of any particular composition.'" *Id.* (quoting *Taylor*, 419 U.S. at 538). Still, if the venire and the jury do fairly represent the community—if the jury is "fair and reasonable in relation to the number of such persons in the community," *Duren*, 439 U.S. at 364—courts need not reach the third step in the analysis. *See, e.g.*, *United States v. Hafen*, 726 F.2d 21, 24 (1st Cir. 1984) (concluding appellant had "failed to carry his burden of showing underrepresentation" and therefore declining to "reach the 'systematic exclusion' prong of the *Duren* test").

Corbett and Jackson argue, and the United States does not dispute, "Black individuals are members of a distinct group" under the first *Duren* prong. ECF No. 881 at

---

[10] Because the "constitutional and the statutory requirement have been construed as functional equivalents," *United States v. Hafen*, 726 F.2d 21, 23 (1st Cir. 1984), the analysis under the Jury Selection and Service Act and the Sixth Amendment is the same.

5; ECF No. 884 at 7. I agree. Black people "are unquestionably a 'distinctive' group for the purposes of a fair cross-section analysis." *Royal*, 174 F.3d at 6.

Defendants' claim fails at the second *Duren* prong, however. They argue "the data and information provided by the Jury Administrator regarding the jury pool . . . demonstrates a significant statistical disparity between the racial makeup of the jury pool and that of the surrounding community. The disparity is of such nature and degree to give rise to a violation of Due Process, Equal Protection, and 28 U.S.C. § 1861." ECF No. 881 at 5.

The First Circuit has held that, in cases like this one where a very small portion of the population is made up of Black persons, underrepresentation should be measured using the "absolute disparity" method. *Hafen*, 726 F.2d at 24. "Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel." *Royal*, 174 F.3d at 6. For example, in this case, we would measure the percentage of Black people in the Bangor division[11] and subtract from it the percentage of Black people in the venire. The resulting number is the absolute disparity. Although the parties dispute which group of prospective jurors to consider in order to perform the absolute disparity test, the analysis using any of the groups demonstrates a constitutionally sound venire and jury pool.

---

[11] At argument, Defendants suggested the Court could dismiss this jury pool and create a jury pool including jurors from Division 2—the Portland division. However, even if the Court could order such a pool at this stage contrary to the approved Jury Plan—which the Court doubts—including Division 2 would not appreciably move the statistical needle. Black people form 1.2% of the population in the District of Maine (both Division 1 and Division 2), only 0.5 percentage points higher than the population of Black people in Division 1 alone.

The Black or African American population is 0.7% of the total population of Division 1, from which the Bangor jury pool is drawn. ECF No. 872-16 at 3. Of the 6493 potential jurors on the qualified wheel as of November 6, 2024, 26 identified as Black or African American persons, representing 0.40% of the wheel. ECF No. 872-13. Of the 275 jurors summonsed for the period from October to December 2024, two identified as Black or African American persons, representing 0.73% of the pool. ECF No. 872-3. Of the 104 jurors who reported for selection on November 6, 2024, none identified as Black or African American persons, representing 0% of the reporting jurors. ECF No. 872-6.

Applying the absolute disparity analysis to each of these groups shows the jury venire is constitutionally sound. The absolute disparity between the percentage of Black people in the Division 1 population (0.7%) and the percentage of Black people in the Division 1 qualified wheel (0.4%) shows Black people are underrepresented in that group by 0.3%. The absolute disparity between the percentage of Black people in the Division 1 population (0.7%) and the percentage of Black people in the group summonsed for October to December 2024 (0.73%) shows Black people are *overrepresented* in that group by 0.03%. Finally, the absolute disparity between the percentage of Black people in the Division 1 population (0.7%) and the percentage of Black people in the group of jurors who reported on November 6, 2024, (0.0%) shows Black people are underrepresented in that group by 0.7%.[12]

---

[12] At a hearing on November 26, 2024, counsel for Defendants suggested Black people constitute 0.38% of the qualified wheel, leading to an absolute disparity of 0.32%. In *United States v. Muller*, using the same Master Wheel but at an earlier date in time so including less individuals, the Court found that an absolute disparity of 0.32% did not constitute a fair cross-section violation. *United States v. Muller*, No. 19-cr-00109-NT, 2022 WL 2953073, at *4 (D. Me. July 26, 2022). The United States performs its analysis using updated data as of November 6, 2024. *See* ECF No. 884 at 9.

9

These disparities are insufficient to establish that the representation of Black people in the venire is not "fair and reasonable in relation to the number of [Black people] in the community." *Duren*, 439 U.S. at 36; *see, e.g.*, *Hafen*, 726 F.2d at 23 (finding an absolute disparity of 2.02% did not show unconstitutional underrepresentation); *United States v. Pion*, 25 F.3d 18, 24 (1st Cir. 1994) (describing a 3.4% absolute disparity as "relatively small"); *Royal*, 174 F.3d at 7 (noting "cases from other circuits that accepted absolute disparities of up to 10%").

Because the venire represents a fair and reasonable cross-section of the community, Defendants' challenge fails at the second *Duren* prong, and I need not reach the third *Duren* prong.[13] *See Royal*, 174 F.3d at 11.

## II. Exemption of Occupational Classes and Groups

Defendants also argue the jury selection process is not "random" because it permits "exemptions, excusals, and deferrals" of potential jurors in "'occupational classes and groups . . .' beyond those authorized by" the Jury Selection and Service Act. ECF No. 881 at 6–9; *see* 28 U.S.C. § 1861 *et seq*.[14] A defendant may only challenge a "substantial failure to comply" with the statute. § 1867(a). Insubstantial and merely "technical" violations do not require dismissal. *See United States v. Capone*, 683 F.2d 582, 589 (1st Cir. 1982).

The Court is statutorily entitled to excuse the "occupational classes and groups" Defendants identify. Section 1863(b)(5)(A) provides a jury plan may "specify those groups of persons or occupational classes whose members shall, on individual request therefore, be excused from jury service . . . if the district court finds, and the plan states, that jury

---

[13] Defendants have made no argument and presented no evidence indicating systematic exclusion of any kind in any event.
[14] Defendants assert this challenge is distinct from the racial inequity challenge described above, and they do not argue, nor is there any evidence or suggestion, that this process amounts to systematic exclusion under the third *Duren* prong.

10

service by such class or group would entail undue hardship or extreme inconvenience." 28 U.S.C. § 1863(b)(5)(A). The Court made exactly that finding, and the Jury Plan so states. Jury Plan at 7. Although Defendants argue the Plan could be clearer as to the reasons why the Court made this finding, even if that were true, nothing in the statute or case law so requires.

Indeed, courts have upheld the excusal of similar classes and groups. *See, e.g.*, *United States v. Eskew*, 460 F.2d 1028, 1029 (9th Cir. 1972) (upholding jury plan excusing persons over seventy and women with children under twelve); *United States v. Horton*, 526 F.2d 884, 889 (5th Cir. 1976) (upholding jury plan excusing sole proprietors); *see also* 28 U.S.C. § 1865(b)(1) (requiring jurors to have "resided for a period of one year within the judicial district"); 28 U.S.C. § 1869(j) (defining "undue hardship or extreme inconvenience" to include "great distance, either in miles or traveltime, from the place of holding court").

Therefore, the classes and groups identified as excusable for undue hardship by individual request under the Jury Plan are not "beyond the classes allowed by statute," ECF No. 881 at 7, so Defendants' claim on this point must fail.

### III. Equal Protection

Finally, Defendants argue the venire composition violates their equal protection rights under the Fifth Amendment.[15] ECF No. 881 at 4; U.S. Const. amend. V. A jury

---

[15] The Fifth Amendment does not provide equal protection rights by its terms, but the Supreme Court has nonetheless recognized an "equal protection component of the Fifth Amendment's Due Process Clause." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 204 (1995); *see Raso v. Lago*, 135 F.3d 11, 15 n.4 (1st Cir. 1998) ("The Fifth Amendment's Due Process Clause embodies the core of the equal protection doctrine . . . ."). "We evaluate Fifth Amendment equal protection claims under the same standards as equal protection claims under the Fourteenth Amendment." *Perrier-Bilbo v. United States*, 954 F.3d 413, 432 n.14 (1st Cir. 2020).

11

challenge invoking the Fifth Amendment is technically distinct from a fair cross-section challenge under the Sixth Amendment, but the analysis is substantially similar.

To succeed on an equal protection jury challenge, the defendant must "(1) 'establish that the group . . . is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied,' (2) prove 'the degree of underrepresentation . . . by comparing the proportion of the group in the total population to the proportion called to serve as . . . jurors, over a significant period of time,' and (3) show discriminatory intent." *United States v. Muller*, No. 19-CR-00109-NT, 2022 WL 2953073, at *5 (D. Me. July 26, 2022) (quoting *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)).

Even assuming Defendants could meet the first two prongs of the analysis—that Black people form a distinct class for purposes of an equal protection analysis and there has been a historical underrepresentation of Black jurors "over a significant period of time"—there is no evidence of discriminatory intent. *See Muller*, 2022 WL 2953073, at *5; *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996) ("[T]he most crucial factor in an equal protection case is a showing of discriminatory intent."). The jury selection procedure prescribed by the Jury Plan is not "susceptible of abuse" and is racially neutral. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977). The District of Maine employs a "purely randomized selection process" designed to "ensure that the mathematical odds of any single name being picked are substantially equal." Jury Plan at 3–4. Exemptions and excusals are permitted only based on objective criteria identified in the Jury Plan. *Id.* at 497 (noting a "highly subjective" system supports a finding of discrimination). Therefore, Defendants' equal protection claim fails.

## CONCLUSION

For the foregoing reasons, Defendants' motion is DENIED.

**SO ORDERED.**

Dated this 27th day of November, 2024.

/s/ Stacey D. Neumann
**STACEY D. NEUMANN**
**U.S. DISTRICT JUDGE**
